In the Matter of the ESTATE OF Leo E. STANTON, Deceased.

Agnes GASSMANN, Petitioner and Appellant,

v.

J. Francis STANTON, Personal Representative of the Estate of Leo E. Stanton, Respondent and Appellee.

Civ. No. 900421.

Supreme Court of North Dakota.

June 25, 1991.

---

Alan C. Erickson, Bismarck, for petitioner and appellant.

Lawrence R. Klemin, Bismarck, for respondent and appellee.

VANDE WALLE, Justice.

Agnes Gassmann appealed from a judgment and an order granting summary judgment entered in Emmons County Court denying Agnes's objections to the probate of the will of Leo E. Stanton. We affirm.

Leo E. Stanton, a lifelong bachelor without issue, died January 20, 1989. Leo was survived by one sister, Agnes Gassmann, and four brothers, J. Francis, Miles, Victor and Lawrence Stanton. Leo's death was preceded by a lengthy period of infirmity following a stroke he suffered in 1977. In January 1979, a conservatorship was established for Leo which continued until his death a decade later.

On February 6, 1989, a will was admitted to probate and Francis was appointed as personal representative. The will, purportedly executed in 1974, named Francis, Miles, and Victor as beneficiaries, but did not name Agnes or Lawrence. The will was originally filed with the Emmons County Court by Francis in April 1979.

On June 22, 1989, Agnes filed objections to probate of the will. Agnes sought a jury trial as to all factual objections raised. Among her objections were allegations of forgery, fraud, undue influence, incompetency, absence of due execution, and revocation by the testator. Following discovery, the trial court granted a motion for summary judgment made by Francis, as personal representative. On appeal, Agnes contends that not only have the proponents of the will not met their burden of showing that there is no genuine issue of material fact, her objections to probate of the will are supported by sufficient evidence to preclude summary judgment.

■ Our law regarding summary judgment is well-settled. In *Miller Enterprises v. Dog N' Cat Pet Centers*, 447 N.W.2d 639 (N.D.1989), this Court summarized the standards governing the grant of a summary judgment.

"Under Rule 56, N.D.R.Civ.P., a summary judgment should be granted only if it appears that there are no genuine issues of material fact or any conflicting inferences which may be drawn from those facts. See Rule 56(c), N.D.R.Civ.P.; *Production Credit Ass'n of Minot v. Klein*, 385 N.W.2d 485 (N.D.1986); *Poyzer v. Amenia Seed and Grain Co.*, 381 N.W.2d 192 (N.D.1986). The party moving for a summary judgment has the

burden to demonstrate clearly that there is no genuine issue of material fact. *Binstock v. Tschider*, 374 N.W.2d 81 (N.D.1985); *Latendresse v. Latendresse*, 294 N.W.2d 742 (N.D.1980). In considering a motion for summary judgment the court may examine the pleadings, depositions, admissions, affidavits, interrogatories, and inferences to be drawn therefrom to determine whether summary judgment is appropriate. *Everett Drill. Vent. v. Knutson Flying Serv.*, 338 N.W.2d 662 (N.D.1983); *First Nat. Bank of Hettinger v. Clark*, 332 N.W.2d 264 (N.D.1983). In doing so, the court must view the evidence in a light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the evidence. See *Stokka v. Cass Cty. Elec. Co-op., Inc.*, 373 N.W.2d 911 (N.D.1985); *Everett Drill. Vent. v. Knutson Flying Serv., supra.*" (Footnote omitted.)

Additionally, the court must consider the substantive evidentiary standard of proof when ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *State Bank of Kenmare v. Lindberg*, 471 N.W.2d 470 (N.D.1991). The key consideration is "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 254, 106 S.Ct. at 2513. We consider these precepts when we analyze the issues raised by Agnes.

Agnes appears to have advanced two distinct theories for this case. The first theory we glean is that the will offered to probate was not duly executed in 1974, its purported date, but was actually executed after Leo had his stroke in 1977, such execution accomplished by undue influence, forgery, or through fraudulent means. The second theory is that the will offered to probate may have been executed in 1974 but such will is not valid due to a lack of testamentary capacity or a subsequent rev-

ocation. We begin our analysis of the issues on appeal with the first theory.

■ As stated, the will was purportedly executed in 1974. The law in effect at the time of execution is controlling in regard to the formal validity of a will. Section 30.1–08–06, NDCC; *Matter of Estate of Thomas*, 290 N.W.2d 223 (N.D.1980). In effect in 1974 was former section 56–03–02, NDCC, which provided:

"Every will, other than a holographic will and a nuncupative will, must be executed and attested as follows:

"1. It must be subscribed at the end thereof by the testator himself, or some person, in his presence, and by his direction, must subscribe his name thereto;

"2. It must be subscribed in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority;

"3. The testator, at the time of subscribing or acknowledging the same, must declare to the attesting witnesses that the instrument is his will;

"4. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request, and in his presence;

"5. A witness to a written will must write with his name his place of residence; and a person who subscribes a testator's name by the testator's direction must write his own name as a witness to the will. A violation of this subsection does not affect the validity of the will."

■ Recitals in an attestation clause of a will are presumed to be true and can be used to establish due execution unless the presumption of truth is overcome by clear and convincing evidence. *Matter of Estate of Papineau*, 396 N.W.2d 735 (N.D.1986). Within the 1974 will was the following attestation clause:

"The foregoing instrument, consisting of two pages, was subscribed, published and declared by LEO EDWARD STANTON, single, the testator therein named,

as and for his Last Will and Testament, in our presence, and in the presence of each of us, and we, at the same time, at his request, in his presence and in the presence of each other, hereunto subscribe our names and residences as attesting witnesses at Braddock, Emmons County, North Dakota, this 17th day of December, 1974."

The attestation clause was signed by two witnesses, Edward and Marliss Peterson. Both Edward and Marliss submitted affidavits to the trial court stating that they were attesting witnesses to the will on file with the court and that the will was executed by Leo on December 17, 1974. The attestation clause and the testimony of the witnesses substantiate the proponent's claim that the will was duly executed in 1974 pursuant to section 56–03–02, NDCC.

■ Agnes's claims of undue influence, forgery, and fraud all presuppose that the will offered for probate was not duly executed in 1974 but, rather, was executed after Leo suffered his stroke in 1977. This presupposition ignores the presumption of due execution created by the attestation clause of the will offered for probate, a presumption which must be overcome by clear and convincing evidence for Agnes to prevail. Under the clear and convincing standard, "the evidence must be such that the trier of fact is reasonably satisfied with the facts the evidence tends to prove as to be led to a firm belief or conviction." *Zundel v. Zundel*, 278 N.W.2d 123 (N.D.1979). Thus, viewing the evidence in a light most favorable to Agnes, we consider whether a trier of fact could reasonably be left with a firm belief or conviction that the will was not duly executed in 1974.

The deposition testimony of the Petersons indicates that their memories of the execution are less than complete. The lock box where the will was discovered in 1979 was allegedly entered by Francis in 1978. Agnes submitted an affidavit alleging that Leo stated on two occasions in 1977 that he did not have a will. Finally, Agnes's son John submitted an affidavit alleging that Victor informed him in 1980 that Miles

made a will for Leo after Leo had suffered his stroke.

■ Affidavits opposing summary judgment must be made on personal knowledge and must set forth facts that would be admissible in evidence. Rule 56(e), NDRCivP. Statements constituting hearsay, of course, are generally not admissible unless they fall within an exception to the hearsay rules. Rule 802, NDREv. Rule 801(c), NDREv, defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Leo's alleged statements about having no will are clearly hearsay. Agnes has not suggested an exception to the hearsay rule which would allow such statements to be admitted.[1] Victor's statement, as alleged by John, is likewise hearsay but Agnes contends it is admissible under Rule 804(b)(3), because it is a statement against his pecuniary interest as a beneficiary under the will.[2]

Exceptions to the rule of nonadmissibility of hearsay under Rule 804 are conditioned upon the unavailability of the declarant. *See* Rule 804, NDREv. There is no evidence in the record that Victor was currently unavailable to testify. Victor, in fact, provided testimony by deposition which was available to the trial court.[3] Rule 804(a)(5) provides:

"HEARSAY EXCEPTIONS; DECLARANT UNAVAILABLE

"(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant—

. . . . .

"(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means."

In *State v. Poitra*, 266 N.W.2d 544 (N.D.1978), this Court interpreted Rule 804(a)(5) to mean that a declarant whose testimony was obtainable by deposition was not "unavailable" under the Rule. Because Victor's testimony was obtained by deposition he was available and, therefore, the statements attributed to him by John are inadmissible hearsay.

■ We conclude that the remaining admissible evidence proffered by Agnes is not sufficiently clear and convincing to overcome the presumption of due execution. *See Matter of Estate of Herr*, 460 N.W.2d 699 (N.D.1990) [summary judgment was properly granted when evidence presented to the trial court was insufficient to establish more than a mere suspicion of undue influence in the creation of a will]. Because Agnes has failed to defeat the presumption that the will offered for probate was duly executed in 1974, her allegation that the will proponents subsequently "schemed" to produce a will after Leo's stroke raises no material issue of fact.

Agnes next alleges that, if the will offered to probate was executed in 1974, it is invalid because Leo lacked the testamentary capacity to execute a will at that time. Agnes submitted an affidavit alleging that Leo had a "drinking problem between 1970 and 1976." Her son, John, submitted an affidavit alleging that in 1977 Leo admitted

---

1. Leo's statements were offered by Agnes to prove the truth of the matter asserted, *i.e.,* that Leo had not executed a will prior to 1977. As a general rule, declarations of the testator are inadmissible when offered for the purpose of proving the truth of the facts he states, including declarations that the testator has not made a will. 3 Bowe–Parker: Page on Wills § 29.29 (1961). There is a line of authority which would admit certain declarations made by a testator to prove due execution of a will, *see* Annotation, 62 A.L.R.2d 855, § 9 and cases collected therein. *See also* Rule 803(3) NDREv.

2. In *Williston Co-op Credit Union v. Fossum,* 427 N.W.2d 804 (N.D.1988), we held that, without timely objection, otherwise inadmissible evidence may be considered by the court making a summary judgment determination. In this case, the will proponents timely objected in their "Respondent's Reply to Petitioner's Return To Motion For Summary Judgment" to the hearsay statements contained in the affidavits.

3. Victor stated in his deposition that he did not know of anyone who may have written a will for Leo.

"he was and had been for several years suffering from blackouts and delusions." Finally, Agnes asserts that one of the witnesses to the will, Edward Peterson, was an alcoholic, and that "no man about to execute his last will and testament with the benefit of a lawyer prepared will would out of a wide circle of friends and associates select a practicing alcoholic, more than twenty years younger than he was, to be a witness."

Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Testamentary capacity is presumed and the burden of proving the lack thereof is upon the contestant to the will. *Matter of Estate of Papineau,* 396 N.W.2d 735 (N.D.1986). The critical inquiry in determining testamentary capacity is directed to the condition of mind of the testator at the very time he signed the will. *Matter of Estate of Thomas,* 290 N.W.2d 223 (N.D.1980). In *Matter of Estate of Thomas, supra* at 225, we recited the following standard for testamentary capacity:

"Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts; ... He must also be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed." [Quoting *Stormon v. Weiss,* 65 N.W.2d 475 (N.D.1954).]

The allegations raised by Agnes, even if true, would not establish that Leo lacked testamentary capacity at the very time he signed the will. Frequent drinking is not proof of a lack of testamentary capacity absent evidence of alcohol consumption at the time of the signing. *See In re Estate of Villwok,* 226 Neb. 693, 413 N.W.2d 921 (1987). The only evidence regarding Leo's sobriety, or lack thereof, at the time the will was signed was provided by the deposition testimony of witness Edward Peterson who testified that Leo did not have an alcohol problem and was not under the influence of alcohol at the time the will was signed. Similarly, there is no evidence in the record that Leo was suffering from blackouts or delusions at the time the will was signed. Leo possessed the mental capacity to be the Postmaster in Braddock, North Dakota, from 1967 until his stroke in 1977. Edward Peterson testified that Leo appeared fully competent at the time the will was signed. Finally, Agnes's assertion that Leo's choice of Edward Peterson as a witness demonstrated a lack of testamentary capacity is meritless. Leo and Edward had been close friends for many years. Although Edward was subsequently hospitalized with alcohol abuse problems, the record reveals that he was not drinking during the time period in which the will was signed. Regardless of any alcohol problems, Leo's choice of Edward as a witness does not demonstrate the lack of testamentary capacity.

Agnes's final contention is that even if the 1974 will was properly executed, Leo subsequently revoked the will. Agnes contends that the affidavit of her son, John, alleges facts which, if true, establish that Leo revoked the will following his 1979 stroke. John Gassmann alleged that in 1980 he obtained a certified copy of the will and brought it to Leo and asked him to read it. John's affidavit continued: "As he read it I observed his becoming more and more agitated, tense, and upset while he tried to speak but could not. He read very slowly. When he had finished reading the first page he crumpled both pages of the copy of the will and dropped them in the waste basket and blurted out two words twice: '... fix it ...', '... fix it ...' then he began to cry like a child. That was all he could say." Agnes contends that these actions constitute a revocation of the will.

Section 30.1–08–07, NDCC, sets forth the two methods for revoking a will:

"A will or any part thereof is revoked:

"1. By a subsequent will which revokes the prior will or part expressly or by inconsistency; or

"2. By being burned, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revoking it by the testator or by another person in his presence and by his direction."

Under subsection 2, revocation can only be accomplished when a physical mutilation of the will is coupled with the intent and for the purpose of revocation. Thus, regardless of the testator's intent, a revocation is not effectuated unless there has been a mutilation of the will.

In this case, the physical act of destruction ("crumpl[ing]") was not made of the original will, but rather of a copy of the will. While the destruction of an executed, duplicate will may operate to revoke the original will, *see Will of Nassano*, 199 N.J.Super. 414, 489 A.2d 1189 (1985); *In re Estate of Minsky*, 46 Ill.App.3d 394, 4 Ill. Dec. 884, 360 N.E.2d 1317 (1977); *but see Matter of Succession of Talbot*, 516 So.2d 431 (La.Ct.App.1987), the destruction of an unexecuted or conformed copy is ineffectual as an act of revocation regardless of the testator's intent. *See In re D'Agostino's Will*, 9 N.J.Super. 230, 75 A.2d 913 (1950); *In re Wehr's Will*, 247 Wis. 98, 18 N.W.2d 709 (1945); *see generally* 95 C.J.S. *Wills* § 281.

Our statute requires that the original will be destroyed to effectuate revocation and does not provide for revocation by destruction of a copy. The words uttered by the Wisconsin Supreme Court in 1945 ring as true today:

"It seems to us that to hold that a mutilation of a conformed copy was a revocation would be to interpolate or add to the statute what plainly is not there or to establish a symbolic revocation by judicial decree in the face of a statute which plainly does not mean to recognize it." *Wehr, supra* 18 N.W.2d at 715.[4]

Because Leo did not destroy his will, but allegedly only a copy thereof, he did not effectuate a revocation.

For reasons stated herein, we affirm the summary judgment.

ERICKSTAD, C.J., and MESCHKE and GIERKE, JJ., concur.

LEVINE, Justice, concurring specially.

We first mentioned *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), in a footnote in *PCA of Fargo v. Foss*, 391 N.W.2d 622, 624–25 n. 3 (N.D.1986). It remained a lurking imminence until we took the bull by the horns, so to speak, and applied it in *State Bank of Kenmare v. Lindberg*, 471 N.W.2d 470 (N.D.1991). Now we must further reckon with its implications and with its alteration of the law.

In holding that the substantive standard of proof must be taken into account in deciding a summary judgment motion, the United States Supreme Court assured us that it was not denigrating the role of the jury or authorizing trial by affidavit. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. To the contrary, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...." The Court instructed us that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

The Court's disclaimers remind me of parents' frequent admonitions to their offspring to do as they say, not as they do. Despite all of the Court's protestations, it is difficult for me to understand how, when we apply a clear-and-convincing standard to a ruling on motion for summary judgment, we can avoid considering inferences to be drawn or acting as a jury in assessing weight and credibility of, at least, a posi-

---

4. The applicable Wisconsin statute, section 238.-14, Wisc.Stat., as quoted by the Court in *Wehr*, provided: "No will nor any part thereof shall be revoked unless by burning, tearing, canceling, or obliterating the same, with the intention of revoking it, by the testator or by some person in his presence and by his direction, * * *."

tion, if not specific evidence, though I suspect we indulge in the latter endeavor as well.

*Anderson* effected a "decided change" in summary judgment practice. *See Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989). It made the granting of summary judgment much more available and overcame the practice of denying summary judgment if there was even a suggestion of an issue of fact. *Id.* By holding that the test for deciding a motion for summary judgment is the same as that for a directed verdict motion, the Court must be condoning some review of the weight of the evidence. *See* Childress, *A New Era For Summary Judgments: Recent Shifts At The Supreme Court,* 116 F.R.D. 183 (1987).

So, under *Anderson,* the standard for deciding summary judgment is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Further, when the governing standard of proof is clear and convincing, the evidence must be either qualitatively or quantitatively superior to that offered in a case governed by the preponderance-of-the-evidence standard. Applying the *Anderson* principles, I agree that the evidence presented by the proponents of the will, bolstered by the presumptions of due execution and testamentary capacity, is so one-sided that the proponents must prevail as a matter of law. The mere existence of a "scintilla" of evidence in support of the contestant's position is insufficient to defeat summary judgment. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511–12. There must be evidence on which a jury could reasonably find for the non-movant. *Id.* I agree that in this record there is not.

I, therefore, concur.